**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**CAROL CLOSE,**

        **Plaintiff,**

**v.**                                   **Case No.: 1:17-cv-01219**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

    This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13, 20).

    Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that Plaintiff's motion to remand and request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on

the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On January 7, 2013, Plaintiff Carol Lynn Close ("Claimant") completed applications for DIB and SSI, alleging a disability onset date of July 1, 2010, (Tr. at 167-84), due to "back and neck problem, right elbow pain, mental condition, bipolar, hardening of arteries, severe depression, 3 heart valves leaking, COPD, asthma, arthritis in hips, numbness in hands and arms, migraines, bladder is tilted, severe degenerative disease in [her] back, heart disease." (Tr. at 198). The Social Security Administration ("SSA") denied Claimant's applications initially and on reconsideration. (Tr. at 98, 103, 114, 118). Claimant filed a request for an administrative hearing, (Tr. at 122), which was held on June 15, 2015, before the Honorable Anne V. Sprague, Administrative Law Judge ("ALJ"), (Tr. at 867-900). During the hearing, Claimant amended her alleged onset date to October 16, 2012, which was the day following an unfavorable decision on her prior applications for benefits. (Tr. at 870-71). By written decision dated October 21, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 9-26). The ALJ's decision became the final decision of the Commissioner on January 23, 2017, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant moved to remand the action on the basis that the Transcript of the Administrative Proceedings did not contain a transcript of the administrative hearing. (ECF No. 11), and Claimant also moved for summary judgment, (ECF Nos. 12, 13). The

Commissioner filed a supplement to the record, which included the full administrative hearing transcript, (ECF No. 14), and also filed a Brief in Support of Defendant's Decision. (ECF No. 20). Accordingly, the substantive issues are fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 43 years old on her amended alleged onset date and 46 years old on the date of the ALJ's second decision. (Tr. at 263). She has the equivalent of a high school education and communicates in English. (Tr. at 197, 199). Claimant previously worked as a carpenter. (Tr. at 200, 895-96).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§

404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance benefits through December 31, 2015. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 1, 2010, the original alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "asthma, cervical and thoracic degenerative disc disease, history of migraines, depression, and anxiety." (*Id.*, Finding No. 3).

Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-17, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that she possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can lift/carry 10 pounds occasionally and less than 10 pounds frequently. The claimant can sit for 6 hours in an 8-hour workday and stand/walk for 4 hours in an 8-hour workday. She can frequently reach overhead bilaterally as well as reaching in other directions. She can occasionally climb ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. She should not be exposed to heights, machinery, vibrations, dust, chemicals, or fumes. She is limited to simple, routine work activity with no public interaction.

(Tr. at 17-18, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of her past relevant work. (Tr. at 18-19, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 19-20, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1969, and was defined as a younger individual on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because

the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 19, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including sedentary unskilled work as a material handler or inspector/tester/sorter. (Tr. at 19-20, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 20, Finding No. 11).

## IV.  **Claimant's Challenges to the Commissioner's Decision**

Claimant raises several challenges to the Commissioner's decision. First, Claimant contends that the Court cannot meaningfully review the ALJ's decision due to the absence of the administrative hearing transcript in the record. (ECF No. 13 at 6). Second, Claimant argues that the ALJ's RFC analysis is insufficient under the relevant social security rulings and regulations because the ALJ failed to articulate a function-by-function analysis or connect the evidence to the ALJ's ultimate conclusions. (*Id.* at 8). Claimant further posits that the ALJ's RFC discussion is most remarkably deficient in its failure to address Claimant's mental limitations and provide explanation and support for the ALJ's finding that Claimant was limited to simple, routine work activity with no public interaction. In support, Claimant cites to the United States Court of Appeals for the Fourth Circuit's ("Fourth Circuit") decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), which purportedly holds that restricting an individual to simple, routine tasks or unskilled work does not automatically account for moderate limitations in concentration, persistence, or pace. (*Id.* at 8-9). In her third challenge, Claimant argues that the ALJ's analysis of her credibility and pain "lacks any substance in terms of analysis or explanation" and failed to follow the regulatory mandates. (*Id.* at 9-10). In addition, Claimant contends that the

ALJ inappropriately assessed her credibility before determining her RFC. (*Id.* at 11). In her next challenge, Claimant asserts that the ALJ improperly discounted the opinion of her treating physician, Eric McClanahan, D.O., dated October 15, 2015, which found that Claimant was more restricted than the ALJ concluded. (*Id.* at 11-12). Lastly, in her final challenge, Claimant argues that the ALJ failed to provide enough discussion to show that she considered the entire record; for instance, Claimant states that the ALJ analyzed her physical impairments in a single paragraph and did not meaningfully discuss Claimant's psychiatric treatment. (*Id.* at 12-13).

In response to Claimant's challenges, the Commissioner argues that the record has been supplemented to include the administrative hearing transcript. (ECF No. 20 at 12). Moreover, the Commissioner states that Claimant conflates what must be considered and what must be discussed by an ALJ, noting that an ALJ need not comment on every piece of evidence. (*Id.* at 12-13). The Commissioner argues that this case is distinguishable from *Mascio* because the ALJ explained the basis for the mental limitations and why no further limitations were warranted. (*Id.* at 14-15). As to the ALJ's analysis of Claimant's physical impairments, the Commissioner points to medical evidence that she contends supports the ALJ's determination that Claimant could perform a limited range of sedentary work. (*Id.* at 16-17). Finally, the Commissioner states that the ALJ properly rejected Dr. McClanahan's "check-box opinion" that Claimant could not perform even the modest demands of sedentary work because it was inconsistent with Dr. McClanahan's own treatment notes and the other evidence in the record. (*Id.* at 20-21).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The evidence

most relevant to the issues in dispute has been summarized below. Because Claimant's amended alleged onset date directly follows a previously adjudicated period, the undersigned delineates which records correspond to the prior period and which records occurred on or after Claimant's alleged onset of disability.

### A. Treatment Records

#### 1. Prior to Alleged Onset of Disability

On March 7, 2012, Claimant saw cardiologist Jack C. Meshel, M.D., at the referral of Dr. McClanahan, to evaluate Claimant's complaints of chest pain radiating into her left arm with shortness of breath and dizziness. Dr. Meshel's impression was that Claimant had chest pain, premature ventricular contractions, mitral valve insufficiency, transient ischemic attacks, and peripheral vascular disease with claudication. (Tr. at 553). Dr. Meshel ordered a myocardial perfusion SPECT scan and a stress test. (*Id.*). The SPECT scan taken the following day was normal with no evidence of ischemia and normal ejection fraction and wall motion. (Tr. at 435). Claimant's stress test was also normal. (Tr. at 436).

On March 14, 2012, Claimant followed up with Dr. Meshel to discuss her test results. Dr. Meshel's impression was that in addition to Claimant's chest pain, transient ischemic attacks, peripheral vascular disease with claudication, and mitral valve insufficiency, she had aortic and tricuspid valve insufficiency. (Tr. at 552). The plan was for Claimant to have a cardiac catheterization and take Aspirin daily. (*Id.*). Claimant followed up with Dr. Meshel again on April 4, 2012 and Dr. Meshel noted that Claimant's cardiac catheterization showed no significant disease, although she had some minimal spasms. (Tr. at 551). Dr. Meshel's impression at that point was that Claimant suffered from chest pain, mitral valve insufficiency, transient ischemic attacks, and premature

ventricular contractions. (*Id.*). Claimant's dosage of Aspirin was reduced and she was prescribed Plavix. (*Id.*).

On May 23, 2012, Claimant had a bronchoprovocation challenge test that was strongly suggestive of asthma. (Tr. at 437). The following month, on June 4, 2012, Claimant saw Oscar Figueroa, M.D., at Bluefield Pulmonary Consultants, Inc., for follow-up regarding her asthma. (Tr. at 503). Dr. Figueroa noted that Claimant was a smoker. (Tr. at 504). Claimant denied having any chest pain, shortness of breath, or back pain. (*Id.*). Her physical examination was normal, including clear breath sounds, no shortness of breath, regular sinus rhythm, normal musculoskeletal findings, and intact gait and coordination. (Tr. at 505). Claimant was prescribed a nicotine inhaler and Dulera inhaler. (*Id.*). Claimant had further lung function testing on June 5, 2012, which was likewise strongly suggestive of asthma. (Tr. at 525-28).

In June through August 2012, Claimant continued to follow up with Dr. Meshel. Her diagnoses remained the same and she was to continue her medications. (Tr. at 547-50). On July 2, 2012, x-rays were taken of Claimant's back, shoulders, and pelvis to evaluate her pain complaints, but all results were normal. (Tr. at 409, 439-40).

On July 18, 2012, Claimant followed up with Dr. Figueroa. She was doing somewhat better on Advair, but did not tolerate Dulera, so that medication was replaced with Spiriva. (Tr. at 506). The oxygen saturation in Claimant's blood was 99 percent in room air. (Tr. at 508). Claimant's respiratory, cardiovascular, musculoskeletal, and psychiatric examinations were all normal. (*Id.*).

On August 30, 2012, Claimant presented to the emergency room at the Clinch Valley Medical Center due to an abscess on her back from a spider bite. (Tr. at 360). She denied any malaise, weakness, chest pain, shortness of breath, headache, or other

cardiovascular, respiratory, neurological, or musculoskeletal/lymphatic issues, although she continued to smoke one pack of cigars per day. (Tr. at 361-62). Claimant's respiratory, cardiovascular, and neurological examinations were normal and she had a steady gait with no neurological deficits. (Tr. at 363-64).

On September 10, 2012, Claimant saw Carol Felts, FNP-BC, at the office of her psychiatrist, Philip B. Robertson, M.D. Claimant advised Ms. Felts that she was very depressed because her adult daughter was being evicted and had two small children. (Tr. at 501). Her current mental status examination was normal other than her depressed and anxious mood. (*Id.*). Ms. Felt's assessment was that Claimant had bipolar disorder for which Claimant was prescribed Prozac, Xanax, and Abilify. (*Id.*).

On September 22, 2012, Claimant was transferred to Clinch Valley Medical Center from Tazewell Medical Center due to acute infectious colitis. Claimant reported mild shortness of breath, but her physical examination revealed that she was in no respiratory distress and had normal cardiac rhythm. (Tr. at 395). On the second day of her admission, Claimant reported moderate back pain that she rated 5 out of 10 in severity; she stated that Percocet was not helping her back pain, nor did the Lortab that she typically took at home. (Tr. at 398). Claimant no longer had chest pain or shortness of breath. (*Id.*). Her chest x-ray showed no active cardiopulmonary disease. (Tr. at 402). Claimant's colitis improved and her pain resolved with treatment over the course of two days. (Tr. at 393). She was discharged in stable condition and was to follow up with a colonoscopy in six weeks. (*Id.*). On the date of her discharge, Claimant was doing "very well" and still denied any chest pain or shortness of breath. (Tr. at 397).

On October 10, 2012, Claimant saw Dr. McClanahan for follow-up after her hospitalization for colitis. (Tr. at 414). Claimant reported that her anxiety symptoms were

stable and she was doing well as far as her chronic pain. (*Id.*). She continued to smoke daily, but denied cardiovascular, pulmonary, musculoskeletal, neurological, or psychiatric complaints. (Tr. at 415). Likewise, an examination of those systems was normal, including normal sinus rhythm; clear breath sounds; normal gait, station, strength, and range of motion; no focal deficits; and normal affect, mood, and orientation. (Tr. at 416). Claimant was diagnosed with hypertension, asthma, generalized anxiety, chronic pain, hyperlipidemia, colitis, and unspecified urinary incontinence. (Tr. at 416-17). Claimant was to continue her treatment plan, which consisted of an albuterol inhaler, blood pressure and blood thinner medications, vitamin supplements, gastrointestinal medications, Aspirin, a muscle relaxer, Lortab, Prozac, and Xanax. (Tr. at 417). Diet and exercise were also encouraged, and Claimant was counseled on smoking cessation and offered medication to help her quit smoking. (Tr. at 417-18).

### 2. Beginning on Alleged Onset of Disability

On October 16, 2012, Claimant saw Dr. Figueroa for follow up regarding asthma. Claimant denied chest pain, shortness of breath, back pain, headaches, and myalgias. (Tr. at 509). Claimant continued to smoke one pack of cigars per day. (Tr. at 510). Her respiratory, cardiovascular, and musculoskeletal examinations were normal. (Tr. at 511). Claimant's prescriptions for Singulair, Advair, an albuterol nebulizer solution, and nicotine patches were renewed. (*Id.*).

On November 12, 2012, Claimant followed up with her cardiologist, Dr. Meshel. Her diagnoses remained the same and she was to continue her medications. (Tr. at 546). Later that month, on November 20, 2012, Claimant saw neurologist Bandhu Paudyal, M.D., at Bluefield Neurology, due to her complaints of pain in her upper and lower extremities for the past 20 years. (Tr. at 650). Claimant reported pain in both hands that

was worse with movement, such as bending her wrists, and pain that radiated from her hips down the back of her legs, particularly in her left leg. (*Id.*). Claimant did not have any weakness in her extremities. (*Id.*). She had "light headaches," but no chest pain, breathing difficulties, vomiting, nausea, memory issues, depression, anxiety, or impulse control issues. (*Id.*). Her review of systems was otherwise normal except for her complains of occasional urinary incontinence and chronic lower back and neck pain. (*Id.*). On examination, Claimant's high mental function was normal, including scores of 3 out of 3 on registration, short-term recall, and intact long-term memory. (Tr. at 652). Her mini mental status score was 30 out of 30. (*Id.*). Claimant's muscle strength was normal and she had no atrophy, but flexion in her hips was slightly limited. (Tr. at 653-54). Her sensation in her left hand and leg was decreased as compared to her right side, but her gait was completely normal. (Tr. at 654). Dr. Paudyal stated that it was difficult to ascertain a single neurological localization of her symptoms. (Tr. at 655). He believed that she might possibly have cervical myelopathy or carpal tunnel syndrome along with lumbosacral radiculopathy. (*Id.*). Dr. Paudyal ordered a MRI of Claimant's cervical spine and a nerve conduction study. (*Id.*). On December 7, 2012, Claimant saw Dr. Paudyal again for follow- up. Claimant was not able to obtain the MRI because it was denied by her insurance company. (Tr. at 632). However, her nerve conduction/EMG study was normal. (Tr. at 637).

On December 17, 2012, Claimant told Ms. Felts that she was very stressed due to her adult daughter's issues and would like to try something besides medication. (Tr. at 500). Her mental status examination was normal other than her depressed and anxious mood. (*Id.*). Ms. Felts assessed Claimant with stress and bipolar disorder for which she was prescribed Abilify, Prozac, and Xanax. (*Id.*).

On December 26, 2012, Claimant had a MRI of her cervical spine without contrast. Claimant reported having a motor vehicle accident two years earlier and had suffered with migraines since then. She also had neck pain radiating into her bilateral upper extremities causing numbness. (Tr. at 406). The MRI showed mild degenerative disc disease with foraminal stenosis at C5-6 that was moderate to severe on the right and moderate on the left. (*Id.*).

On January 8, 2013, Claimant saw Dr. Figueroa regarding asthma and indicated that the albuterol nebulizer solution was helping her. She denied chest pain or palpitations, shortness of breath, back pain, myalgias, headaches, weakness, dizziness, anxiety, depression, or sleep disturbances. (Tr. at 512). Claimant's oxygen saturation was 99 percent. (Tr. at 514). Her respiratory, cardiovascular, musculoskeletal, neurological, and psychiatric examinations were normal. (*Id.*). Lung function studies were ordered, and Claimant was recommended to use a nebulizer. (*Id.*).

On January 14, 2013, Claimant saw Dr. McClanahan. Claimant's anxiety was stable and she was doing well in terms of chronic pain. (Tr. at 420). Her respiratory, cardiovascular, neurological, and psychiatric examinations were normal, but she had a stiff gait and neck and complained of right elbow pain. (Tr. at 419, 421). Claimant's treatment plan was continued, except that spinal x-rays would be reviewed. She was advised to rest her right elbow, apply heat and topical pain relief creams, and use an elbow strap. (Tr. at 421-22).

On January 15, 2013, Claimant saw Ms. Felts for mental health treatment. Claimant reported that Wellbutrin was beneficial, but believed that she needed a stronger dosage. (Tr. at 499). Trazodone was causing headaches, but did allow her to sleep. (*Id.*). Claimant's mental status examination was normal other than her anxious mood. Her

memory, judgment, and insight was intact. (*Id.*). Claimant was continued on Wellbutrin, Abilify, Prozac, and Xanax. (*Id.*).

On the same day, Claimant saw Dr. Paudyal, who noted that Claimant's cervical spine MRI was abnormal; it showed increased T2 signal within the left neural foramina cervical root, which was most likely due to trauma in the past, and significant disc herniation at C5-6 with mild spinal canal stenosis. (Tr. at 625). However, there was no definite evidence of cord compression. (*Id.*). Claimant did not want steroid injections or physical therapy at that point. (Tr. at 629). Dr. Paudyal planned to obtain x-rays of Claimant's thoracic spine, because Claimant also complained of thoracic pain. (Tr. at 628).

On January 22, 2013, Claimant followed up with Dr. Meshel. Her diagnoses remained the same and she was to continue her medications. (Tr. at 545). On February 7, 2013, Claimant had repeat thoracic and lumbar spine x-rays, which were again normal. (Tr. at 447-48). Thereafter, on April 10, 2013, Claimant saw Ms. Felts. She continued to be stressed due to her children's issues. However, she was fully oriented with intact memory, judgment, and insight. (Tr. at 498). Her diagnoses and medications remained the same. (*Id.*).

On April 16, 2013, Claimant saw Dr. McClanahan. Her anxiety was stable, she was fully oriented, and had a normal affect and mood. (Tr. at 471, 473). Her respiratory examination was normal, and she had normal gait, station, strength, and range of motion (Tr. at 473). She had slightly weaker muscle strength on her left side. (*Id.*). Claimant's prescriptions were continued. (Tr. at 473-74).

On April 17, 2013, Claimant followed up with Dr. Meshel. Her diagnoses remained the same and she was to continue her medications. (Tr. at 543). Dr. Meshel ordered

testing after which he added the additional diagnosis of superficial phlebitis of the legs. (*Id.*). Later that month, on April 25, 2013, Claimant followed up with Dr. Meshel regarding her cardiac complaints. Her diagnoses remained the same and she was to continue her medications. (Tr. at 542).

On May 1, 2013, Claimant had a spirometry lung function study that showed minimal obstructive airway disease. (Tr. at 450-54). On May 15, 2013, Claimant saw Dr. Figueroa and stated that she had not gotten her nebulizer or medications and was having daily symptoms. (Tr. at 515). However, she had no chest pain, shortness of breath, back pain, or myalgias. (*Id.*). She still smoked one pack of cigars per day. (Tr. at 516). Claimant's respiratory, cardiovascular, musculoskeletal, neurological, and psychiatric examinations were normal. (Tr. at 517). Her prescriptions for Advair, an albuterol nebulizer solution, and Singulair were refilled. (*Id.*).

On July 8, 2013, Claimant told Dr. McClanahan that her back pain was worsening in both her upper and lower back, radiating into her wrists and ankles and causing some numbness and weakness in her hands and feet. (Tr. at 467). Claimant stated that the pain was present for the past few months, beginning shortly after her last visit. (*Id.*). Her anxiety symptoms were stable, and her psychiatric examination was normal. (Tr. at 468-69). She had no respiratory issues on examination, normal gait and station, and full range of motion and upper extremity strength. (Tr. at 469). Although she had some jerking weakness in her lower extremities, she had no synovitis. (*Id.*). Claimant also had no focal deficits and normal sensation. (*Id.*). Claimant's treatment plan was continued, including Lortab for her chronic pain. (Tr. at 469-70).

On August 1, 2013, Claimant followed up with Dr. Meshel. Her diagnoses remained the same, and she was to continue her medications. (Tr. at 541). On August 8, 2013,

Claimant reported to Dr. McClanahan that she still had back, hip, and neck pain that was unchanged; however, she was "doing well" as far as her chronic pain. (Tr. at 463). Her respiratory examination was normal, and she had a normal gait and station, strength, and range of motion on her musculoskeletal examination. (Tr. at 465). Her affect and mood were normal; she was oriented in all spheres; and she had no neurological deficits. (*Id.*). She was to continue Metoprolol for hypertension; Advair and Albuterol for asthma; hydrocodone for chronic pain; Xanax, Prozac, and Abilify for generalized anxiety; her high cholesterol medications and vitamin supplements; and she was to start a bladder agent for her incontinence. (Tr. at 465-66).

On August 13, 2013, Claimant saw Ms. Felts at Dr. Robertson's office. Claimant was again very overwhelmed by her daughter's issues. (Tr. at 497). She was well groomed, cooperative, and calm with an appropriate affect. (*Id.*). However, her mood was depressed and anxious. (*Id.*). Her immediate and recent memory were impaired, but she was fully oriented with intact judgment and insight. (*Id.*). Ms. Felts assessed Claimant with bipolar disorder, panic disorder, and situational stressors. (*Id.*). Her Prozac was increased, and she was continued on Trazodone, Abilify, Wellbutrin, and Xanax. (*Id.*).

On August 21, 2013, Claimant saw Dr. Figueroa and denied chest pain or palpitations, shortness of breath, back pain, myalgias, headaches, weakness, dizziness, anxiety, depression, or sleep disturbances. (Tr. at 519). Claimant continued to smoke. (Tr. at 520). The oxygen saturation in her blood was 99 percent in room air. (Tr. at 521). Her respiratory, cardiovascular, musculoskeletal, neurological, and psychiatric examinations were normal, and her prescriptions were refilled. (*Id.*).

On August 22, 2013, Claimant followed up with Dr. Meshel. Her diagnoses remained the same and she was to continue her medications. (Tr. at 540). During her

following monthly visit with Dr. Meshel on September 25, 2013, Dr. Meshel diagnosed Claimant with coronary artery disease with angina pectoris, premature ventricular contractions, atrial fibrillation, and mitral valve insufficiency. (Tr. at 539). Dr. Meshel recommend that Claimant continue her medications and return as needed. (*Id.*).

On October 17, 2013, Claimant saw Dr. McClanahan. Claimant reported that she had stopped taking vitamin C and began to feel fatigued with significant memory issues. Once she resumed taking it, her symptoms resolved. (Tr. at 810). She was doing well in terms of her chronic pain, and her anxiety was stable. (Tr. at 810-11). On examination, Claimant's gait and station, coordination, and muscle strength were all normal, as well as her cardiovascular, respiratory, neurological, and psychiatric examinations. (Tr. at 812).

On November 8, 2013, Claimant saw Ms. Felts. She was doing fair, but reported having headaches and experiencing forgetfulness. (Tr. at 576). Her mental status examination was normal other than her depressed and anxious mood. (*Id.*). Ms. Felt surmised that Claimant might possibly have a panic disorder in addition to bipolar disorder. (*Id.*). Claimant was continued on Wellbutrin, Trazodone, Prozac, and Xanax. (*Id.*).

On December 18, 2013, Claimant saw Dr. Figueroa. She was doing well and had cut down on smoking. (Tr. at 578). She denied chest pain or palpitations, shortness of breath, back pain, myalgias, headaches, weakness, dizziness, anxiety, depression, or sleep disturbances. (*Id.*). Her oxygen saturation was 100 percent. (Tr. at 580). Claimant's respiratory, cardiovascular, musculoskeletal, neurological, and psychiatric examinations were normal. (*Id.*). Lung function studies were ordered, and Claimant was instructed to use a nebulizer. (*Id.*). A MRI of Claimant's cervical spine was performed and showed no significant change from her prior study on December 26, 2012. (Tr. at 583). She still had

spondylosis and neural foraminal narrowing at C3-4 on the left and C5-6 bilaterally, but no acute bony abnormalities. (*Id.*). In her thoracic spine, the MRI showed osteophyte complexes that were mild at T6-7 and moderate at T7-8 that were possibly compromising the ventral nerve roots, but no cord compression or acute bony abnormalities. (Tr. at 584).

On January 6, 2014, Claimant saw Dr. Paudyal, stating that she had dizziness and suffered frequent falls during which she hit her head several times and now had chronic headaches and memory loss. (Tr. at 619). Dr. Paudyal documented that Claimant's neurological examination was normal. A repeat cervical spine MRI did not show any enlargement or change in the cystic lesion previously seen. (Tr. at 622). Dr. Paudyal planned to order a CT scan of Claimant's head. (*Id.*).

On April 28, 2014, Claimant saw Dr. McClanahan and reported incontinence, headaches, and shoulder pain, noting that she shoveled coal under her house around two weeks earlier that aggravated her lateral epicondylitis, which she still felt on the left side. (Tr. at 806-07). Claimant denied having depression or anxiety. (Tr. at 807). On examination, her gait and station, coordination, and muscle strength were all normal, as were her cardiovascular, respiratory, neurological, and psychiatric examinations. (*Id.*).

On May 14, 2014, Claimant saw Ms. Felts. Claimant's mental status examination was normal other than an anxious mood. (Tr. at 723). Claimant saw Dr. Figueroa later that month on May 23, 2014. She still denied chest pain or palpitations, shortness of breath, back pain, myalgias, headaches, weakness, dizziness, anxiety, depression, or sleep disturbances. (Tr. at 660). Her oxygen saturation was 97 percent, and her respiratory, cardiovascular, and musculoskeletal examinations were normal. (Tr. at 662). Dr. Meshel ordered a repeat myocardial SPECT scan to evaluate Claimant's complaints of recurrent

chest pain, fatigue, and shortness of breath. (Tr. at 767). The SPECT scan again showed no evidence of ischemia, and Claimant had normal ejection fraction and chest wall motion. (*Id.*). Her stress test was also normal. (Tr. at 768).

On June 2, 2014, Claimant followed up with Dr. Paudyal, who noted that Claimant's neurological examination and CT scan were normal. (Tr. at 612). He recommended that Claimant take Neurontin for her headaches and follow-up as needed. (*Id.*). On June 3, 2014, Claimant saw Dr. McClanahan and complained of incontinence, shoulder pain, and headaches. (Tr. at 802-03). She denied having depression or anxiety. (Tr. at 803). On examination, Claimant's gait and station, coordination, and muscle strength were all normal, as well as her cardiovascular, respiratory, neurological, and psychiatric examinations. (Tr. at 803).

On June 6, 2014, Claimant saw Ms. Felts. Claimant's mental status evaluation was normal other than a depressed and anxious mood. (Tr. at 722). Her diagnoses included bipolar disorder, Generalized Anxiety Disorder (GAD), and adult Attention Deficit Hyperactivity Disorder (ADHD). (*Id.*). Claimant was continued on Xanax, Wellbutrin, and Trazadone. (*Id.*). On June 20, 2014, Claimant had a CT scan of the chest to evaluate her asthma. She had mildly hyper-aerated lungs, but the examination was otherwise unremarkable, and no suspicious masses or nodules were demonstrated. (Tr. at 770).

On July 3, 2014, Claimant again saw Dr. Figueroa, who noted that Claimant was doing well and her CT scan was unremarkable. (Tr. at 663). Claimant continued to smoke. (*Id.*). She still denied chest pain or palpitations, shortness of breath, back pain, myalgias, headaches, weakness, dizziness, anxiety, depression, or sleep disturbances. (*Id.*). Her oxygen saturation was 97 percent. (Tr. at 665). Her respiratory, cardiovascular, musculoskeletal, neurological, and psychiatric examinations were normal. (*Id.*). Dr.

Figueroa diagnosed Claimant with asthma. Her prescriptions of Advair, albuterol nebulizer solution, Singulair, and Ventolin were refilled. (*Id.*).

On August 12, 2014, Claimant saw Dr. McClanahan. Claimant reported improved cognition since stopping Wellbutrin. (Tr. at 798). However, she complained of continued headaches despite taking headache medicine daily and shoulder pain. (Tr. at 798-99). She denied having any anxiety or depression. (Tr. at 799). On examination, her gait and station, coordination, and muscle strength were all normal, as were as her cardiovascular, respiratory, neurological, and psychiatric examinations. (Tr. at 799).

On September 12, 2014, Claimant saw Dr. McClanahan. She complained of a painful left shoulder painful following a rotator cuff injury several months earlier, and she continued to have headaches. (Tr. at 794-95). Claimant smoked five cigars per day. (Tr. at 795). On examination, her gait and station, coordination, and muscle strength were all normal, as well as her cardiovascular, respiratory, neurological, and psychiatric examinations. (Tr. at 796). She was prescribed Percocet and Ditropan. (Tr. at 797).

On October 10, 2014, Claimant returned to Dr. McClanahan's office, reporting numbness in her fingertips; hip and knee pain; abdominal pain and nausea; left-sided facial numbness and slurring of speech when her blood pressure was elevated; short-term memory loss; anxiety; depression; headaches; and shoulder pain. (Tr. at 789-90). She continued to smoke five cigars per day. (Tr. at 790). On examination, Claimant's gait and station, coordination, muscle strength, cardiovascular system, and respiratory system were all normal. (Tr. at 791).

On November 12, 2014, Claimant had a MRI of her brain ordered by Dr. McClanahan due to complaints of a constant headache for six months, dizziness, loss of balance, memory loss, occasional numbness in her hands and feet, and left facial

numbness. (Tr. at 530). Claimant had a mild degree of nonspecific white matter disease, bilateral basal ganglia calcifications that were slightly prominent for her age, a deep venous angioma in her left parietal occipital region, and a small old hemorrhage that was of no current clinical significance. (Tr. at 772, 774).

On December 2, 2014, Claimant returned to Dr. Paudyal for treatment of her headaches. (Tr. at 604). Claimant reported that she had suffered from headaches all of her life. (Tr. at 606). The headaches were relieved by Lortab, and Claimant also noted some symptom improvement with Neurontin. (*Id.*). Claimant had no chest pain or shortness of breath, and her physical examination was normal. (Tr. at 607). Dr. Paudyal increased Claimant's dose of Neurontin to treat her headaches. He also recommended that she quit smoking, take Aspirin, and have a repeat MRI in 6 months to examine the status of her venous angioma. (*Id.*).

On December 23, 2014, Claimant saw Dr. McClanahan. She stated that numbness in her fingertips was worse; she was still "falling a lot and hitting her head;" her lumbar and thoracic pain was getting worse and was radiating, causing numbness in her shoulders and legs. She continued to have headaches and shoulder pain. (Tr. at 785-86). Claimant reported fatigue, shortness of breath on exertion, occasional chest palpitations, joint stiffness and pain, headache, memory loss, anxiety, and depression. (Tr. at 786-87). On examination, Claimant's cardiovascular examination was normal; she had normal coordination and muscle strength; normal breath sounds and respiratory effort; and normal neurological and psychiatric results. Dr. McClanahan documented crepitus in Claimant's left shoulder at 90 degrees. (Tr. at 787). She was prescribed Percocet for chronic pain syndrome, Zofran, Ditropan, Advair, an albuterol inhaler, Colace, Flexeril, Plavix, Singulair, and vitamin B-12. (Tr. at 788).

On May 12, 2015, Claimant had a repeat CT scan of her head that was compared to the scan taken in January 2014 and the MRI taken in November 2014. (Tr. at 777). No acute or significant change from the baseline studies was observed. (*Id.*). X-rays were also taken of Claimant's left knee and thoracic and lumbosacral spine to evaluate her pain complaints, but the results were all negative. (Tr. at 778-79).

On May 11, 2015, Claimant saw Dr. McClanahan and reported that she suffered a closed head injury ten days earlier when she slipped in the woods while hunting mushrooms. Claimant indicated that she struck her head on a rock when she fell. (Tr. at 855). She refused to go to the emergency room, but was still having headaches and confusion. (*Id.*).

On June 10, 2015, Claimant saw Dr. McClanahan. She stated that she continued to have memory issues after her head injury, adding that she had memory issues before the fall, but they had increased in severity afterward. (Tr. at 847). Claimant also complained of knee and shoulder pain and headaches. (*Id.*). On examination, her gait and station, coordination, and muscle strength were all normal, as were her cardiovascular, respiratory, neurological, and psychiatric examinations. (Tr. at 849).

### B. Evaluations and Opinions

#### 1. Prior to Alleged Onset of Disability

On July 18, 2012, Dr. McClanahan completed an Assessment of Ability To Do Work-Related Activities form. He opined that Claimant could lift and/or carry up to 30 pounds occasionally and 15 pounds frequently and could stand and/or walk for only one hour total in a workday and for only 20 minutes without interruption. (Tr. at 354). Dr. McClanahan stated that Claimant could sit for a total of 4 hours in a workday, but only for one hour without interruption. (Tr. at 355). Further, he opined that Claimant could

frequently balance, occasionally climb or stoop, but never kneel, crouch, or crawl. (*Id.*). Dr. McClanahan noted that Claimant's ability to reach, handle, feel, and push/pull were affected by her impairments, and she needed new glasses. However, her speaking ability was unaffected. (*Id.*). In support of his conclusions, Dr. McClanahan referred generally to the osteopathic findings in his office notes and Claimant's x-ray results; he did not specify any certain records or results. (Tr. at 354-55). Further, Dr. McClanahan found that Claimant's asthma, COPD, and migraines caused widespread environmental restrictions, although he felt she could withstand exposure to vibration. (Tr. at 356). Finally, Dr. McClanahan opined that Claimant would miss more than 2 days per month of work due to her impairments and her impairments rendered her "unable to perform some activity of daily living." (*Id.*).

On August 13, 2012, Claimant's treating medical providers, Dr. Robertson and Ms. Felts, completed an assessment of Claimant's ability to do mental work-related activities. They concluded that Claimant had a good ability to function independently and a fair ability to follow work rules and maintain attention and concentration, but a poor ability to interact with others, deal with work stress, and use judgment. (Tr. at 357). They noted that Claimant had a history of bipolar disorder and GAD. They felt that Claimant could not participate in group activities due to her panic attacks,  anger issues, poor concentration, and poor focus, adding that Claimant had been fired from jobs due to her inability to get along with others. (*Id.*). Dr. Robertson and Ms. Felts opined that Claimant had a fair ability to understand, remember, and carry out simple job instructions, but a poor ability to understand, remember, and carry out detailed or complex job instructions. They indicated that Claimant's anxiety and bipolar disorder currently affected her ability to concentrate and focus. (Tr. at 358).  Further, although Claimant had good ability to

24

maintain her personal appearance and fair ability to behave in an emotionally stable manner, she had poor ability to relate predictably in social situations and demonstrate reliability. (*Id.*). Dr. Robertson and Ms. Felts stated that Claimant's bipolar disorder caused extreme mood swings with often debilitating depression that resulted in days in which Claimant did not get out of bed. Her energy level was extremely low, and she was often unable to care for herself and her home. (Tr. at 359). They believed that Claimant's impairment would cause her to miss more than 2 days of work per month. (*Id.*).

### 2. Subsequent to Alleged Onset of Disability

On July 11, 2013, Claimant underwent a mental status examination performed by licensed psychologist Teresa E. Jarrell, M.A., for the West Virginia Disability Determination Service. Claimant drove herself to the examination, but her posture was stiff and her gait was slow. (Tr. at 455). Claimant reported receiving outpatient psychiatric treatment from Dr. Robertson, but no psychotherapy. (Tr. at 457). She smoked one pack of cigars daily. (Tr. at 458). On examination, Claimant was attentive, cooperative, and polite, although she appeared mildly anxious and irritable. (*Id.*). She was oriented in all spheres and had linear thought processes and relevant thought content. (*Id.*). Her insight, judgment, and recent memory were moderately deficient; her concentration was mildly deficient; and her immediate and remote memory were within normal limits. (Tr. at 458-59). Ms. Jarrell's diagnoses included bipolar disorder, panic disorder with agoraphobia, GAD, and pain disorder associated with both psychological factors and a general medical condition. (Tr. at 459). In a typical day, Claimant woke around 10 o'clock in the morning, watched television, cared for her horses, tended to her own personal hygiene, prepared simple meals, washed dishes, swept, and did laundry when it was her turn. (Tr. at 460). Claimant occasionally talked to her sister on the telephone, went grocery shopping once

or twice per month, and wrote to her son in jail once a month. (*Id.*). Claimant's persistence was normal and her pace was only mildly slow during the evaluation. (*Id.*).

On July 31, 2013, Claimant had a consultative examination performed by Andres L. Rago, MD, for the West Virginia Disability Determination Service. Claimant slightly limped, favoring her left leg, but did not use an assistive device to ambulate. (Tr. at 490). She had to reposition herself intermittently when sitting due to back and hip pain. (*Id.*). She had no difficulty rising from a seated position, could walk on her heels and toes, but could not fully squat due to complaints of hip pain. She had difficulty getting on and off of the examination table. (*Id.*). Claimant also had notable limitation of motion in her right shoulder, slight limitation of motion in her left hip, and slight tenderness in her lumbar spine, although her normal neurological findings were normal, including no muscle weakness or atrophy. (Tr. at 491). Dr. Rago diagnosed Claimant with chronic low back syndrome with radiculopathy; possible degenerative arthritis and/or degenerative disc disease of the lumbosacral and cervical spine; chronic tendonitis in her right elbow; possible degenerative arthritis in her shoulder and hip joints; atherosclerosis and history of heart disease; COPD; asthma; migraine headaches; stress incontinence and signs of an overactive bladder; chronic anxiety characterized as panic disorder; and depressive symptoms, racing thoughts, and mood swings suggestive of bipolar disorder. (Tr. at 492).

On August 20, 2013, agency psychologist, Jeff Boggess, Ph.D., evaluated Claimant's mental impairments based upon a review of her records. Dr. Boggess found that Claimant had non-severe affective, anxiety, and somatoform disorders. (Tr. at 57). He concluded that Claimant had only mild restriction in activities of daily living; social functioning; and maintaining concentration, persistence, or pace; as well as no repeated episodes of decompensation of extended duration. (Tr. at 58). Dr. Boggess noted that

although the Claimant was found to have moderate limitations in social functioning and concentration, persistence, or pace in the prior ALJ's decision in October 2012, the current consultative examination found only mild limitations. (*Id.*). Therefore, Dr. Boggess stated that new medical evidence of record since the prior ALJ's decision did not support the severity of the previous limitations. Although he took the prior findings into account, he did not give them controlling weight. (*Id.*). Dr. Boggess found that Claimant was only partially credible regarding her psychologically based allegations, noting that such allegations were not fully supported by the current consultative examination and mental status examination. (Tr. at 59). Joseph Richard, a second agency expert, affirmed Dr. Boggess's evaluation on December 16, 2013. (Tr. at 90).

Also on August 20, 2013, A. Rafael Gomez, MD, evaluated Claimant's physical RFC based upon a review of Claimant's records. He concluded that Claimant could occasionally and frequently lift and/or carry no more than 10 pounds; stand or walk for 4 hours total in a workday with normal breaks; occasionally perform postural activities; and should avoid concentrated exposure to temperature extremes, vibration, fumes, and hazards. (Tr. at 59-61). Dr. Gomez noted that Claimant was reduced to sedentary work in the prior ALJ's decision, and he concluded that there was no change in her physical RFC since that time. (Tr. at 61). Saima Noon, MD, affirmed Dr. Gomez's RFC finding on December 17, 2013. (Tr. at 93).

On October 15, 2014, Dr. McClanahan completed another Assessment of Ability To Do Work-Related Activities form. Although Dr. McClanahan noted that Claimant's pain had worsened since his last evaluation, his assessment of Claimant's ability to lift/carry, stand/walk, and sit remained the same as stated in his July 2012 opinion. (Tr. at 599-600). Dr. McClanahan's assessment of Claimant's ability to perform postural activities

27

also remained the same, except that he opined that Claimant could now never climb due to a suspected rotator cuff tear. (Tr. at 600).

### C. Claimant's Statements

Claimant testified during her administrative hearing on June 15, 2015 that she stopped working due to back problems, life-long problems being in groups of people, and occasional incontinence. (Tr. at 875-76). Claimant stated that beginning in February 2013 she could not really feel her feet and fingertips, which Dr. Meshel believed could be due to hardening of the arteries in her legs and neck. (Tr. at 873). Claimant also testified that approximately one year prior, she slipped and fell while walking on a hillside and hit her head on a rock, which caused an angioma. (*Id.*). As to her daily activities, Claimant stated that she used to care for horses, but had to "get rid of them" in approximately June 2013 because she could no longer afford them. (Tr. at 872). Otherwise, Claimant spent much of her time watching television. She could also do the grocery shopping and drive, and she shared household duties, such as cooking and cleaning, with her husband. (Tr. at 874-75, 888). However, Claimant testified that it took her all day to "sweep the house" because she had to take so many breaks due to back and leg pain. (Tr. at 874-75). Claimant stated that she always had problems being in groups of people and felt most comfortable alone; however, she called her mother every day. (Tr. at 876, 887).

## VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

[E]vidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

As an initial matter, the undersigned finds that the record before the Court was supplemented to include the complete transcript of Claimant's administrative hearing. (ECF No. 14). Therefore, Claimant's challenge regarding the absence of the hearing transcript, (ECF No. 11), is **DENIED** as moot, and the undersigned examines Claimant's other challenges raised in this action.

### A. RFC Finding

In her first substantive challenge to the Commissioner's decision, Claimant contends that the ALJ's decision lacks meaningful discussion to support the ALJ's RFC finding, including no function-by-function analysis or explanation connecting the medical evidence to the ALJ's conclusions. Claimant argues that, in addition to failing to assess her physical impairments, what is most remarkably deficient is the ALJ's lack of

analysis of Claimant's mental limitations. As noted, Claimant cites the Fourth Circuit's decision in *Mascio* in support of her argument that the ALJ insufficiently addressed her mental impairments.

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's

functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ determined that Claimant had severe impairments including asthma, cervical and thoracic degenerative disc disease, history of migraines, depression, and anxiety. (Tr. at 14). The ALJ cited Claimant's numerous activities of daily living, which included tending to her self-care needs, preparing simple meals, assisting with laundry and chores, caring for horses, spending time outdoors, and going grocery shopping. (Tr. at 15-16). As to Claimant's physical impairments, the ALJ noted Claimant's MRI showing mild degenerative disc disease in Claimant's cervical spine, pulmonary function testing suggestive of asthma, and brain MRI showing mild nonspecific white disease with basal ganglia calcifications and a deep venous angioma. (Tr. at 17.). The ALJ acknowledged that Claimant complained of back and neck pain, arthritis in her hips, and elbow pain and stated that prolonged sitting aggravated her back pain and she needed to

reposition herself intermittently. (*Id.*). The ALJ reviewed findings from the consultative examination, which indicated that Claimant appeared to limp and favor her left leg, could not fully squat due to hip pain, had slight tenderness in her cervical and lumbar spine, and slight limitation on lateral flexion. Notwithstanding these limitations, Claimant ambulated without an assistive device, could walk on her heels and toes, had no muscle weakness or atrophy, and her fine and gross motor function was intact. (Tr. at 17-18). The ALJ further explained that she afforded great weight to the opinions of the state agency physicians and the prior ALJ, who agreed that Claimant could perform a reduced range of sedentary work. (Tr. at 18). Indeed, the ALJ found that the opinions were consistent with the current medical evidence and Claimant's own statements. As to Dr. McClanahan's contrary opinion that Claimant could only stand or walk for one hour, the ALJ did not find medical evidence to support such limitation and afforded it little weight. (*Id.*).

Regarding Claimant's mental limitations, the ALJ found that Claimant had moderate difficulties in social functioning. (Tr. at 16). The ALJ noted that Claimant reported panic attacks and irritability around others, although she was able to go grocery shopping, attend doctor's appointments, and her social functioning was only mildly deficient during her consultative examination in July 2013. (*Id.*). The ALJ further found that while Claimant reported concentration issues, her concentration and pace were only mildly deficient during her consultative examination. (*Id.*). The ALJ discussed that Claimant reported memory issues and her recent memory was moderately deficient during her consultative examination, but her immediate and remote memory skills were within normal limits. (*Id.*). Based on the above, the ALJ assessed Claimant with moderate restriction in the area of concentration, persistence, or pace. (*Id.*). The ALJ ultimately

gave great weight to the prior ALJ's mental RFC assessment, which restricted Claimant to simple, routine, unskilled work with no public interaction. (Tr. at 18). The ALJ indicated that she was giving Claimant the benefit of the doubt in her mental RFC assessment, as Claimant discontinued psychiatric treatment in June 2014, never received inpatient treatment, was cooperative and answered questioned in a serious motivated manner during her 2013 consultative examination, and related physical issues as the reason that she could not work. (*Id.*). However, due to Claimant's subjective mental allegations, the prior ALJ's decision, and other factors, the ALJ limited Claimant's RFC as noted.

Ultimately, the ALJ reduced Claimant's RFC to a very limited range of sedentary work, requiring no social interaction and only simple, routine tasks. (Tr. at 17). While the ALJ did not specifically comment on every piece of evidence in the record or explicitly discuss each function listed in 20 CFR §§ 404.1545(b-d), 416.945(b-d), the ALJ provided a rational explanation for her RFC determination of both Claimant's physical and mental limitations that is supported by substantial evidence. Unlike other cases, which have necessitated remand because the rationale for the ALJ's findings was non-discernable from the decision, the ALJ's rationale is unambiguous in this case. The ALJ reviewed Claimant's activities, diagnostic testing, and consultative examinations. The ALJ explained that great weight was given to the prior ALJ's decision and the opinions of the state agency consultants, because they were consistent with Claimant's current records. Notably, the agency consultants reviewed the medical evidence accumulated since October 2012, when Claimant was last denied benefits, and concluded that the record did not demonstrate any deterioration in Claimant's physical condition since 2012 and actually showed improvement in her mental condition.

Moreover, the ALJ's RFC finding is very clearly supported by the record. The prior ALJ found that Claimant could perform sedentary work with occasional postural activities. (Tr. at 34-35). The state agency physicians reviewed Claimant's records, including the results of Claimant's July 2013 consultative physical examination, and unanimously agreed that Claimant physical RFC had not changed from the prior ALJ's assessment. (Tr. at 61, 93). Both physicians determined that Claimant could perform work at the sedentary exertional level, stand or walk for 4 hours in a workday with normal breaks, and perform occasional postural activities. (Tr. at 51-60, 91-92). In addition, as late as June 2015, Claimant's physical examination revealed normal gait and station, coordination, and muscle strength. Furthermore, she had normal results on cardiovascular, respiratory, neurological, and psychiatric examinations. (Tr. at 849).

As far as Claimant's assessed mental limitations, the previous ALJ concluded in October 2012 that Claimant could understand, remember, and carry out short, simple tasks and instructions with no public interaction. (Tr. at 35). The state agency psychologist who reviewed the evidence initially found that Claimant did not have any severe mental impairments. On reconsideration, a second state agency psychologist found that Claimant could understand, remember, and carry out simple instructions; remember detailed instructions; sustain extended concentration; perform at a consistent pace; maintain a regular schedule; interact appropriately with others; and respond to basic changes in the work setting. (Tr. at 40). Claimant also had multiple mental consultative examinations that were considered by the prior ALJ in crafting Claimant's mental RFC and the prior ALJ provided a highly detailed analysis of Claimant's allegations, her conservative mental health treatment, and Claimant's mental functional abilities. (Tr. at 37-40). As noted in the decision under review, the ALJ gave great weight to the prior ALJ's

decision because the current experts concluded that Claimant's mental impairments remained stable or were improved from the prior decision, and certainly did not decline.

Claimant's reliance on *Masico* is misplaced in this instance because the ALJ's decision articulates the basis for the ALJ's findings and allows for meaningful review. This is not a case, as in *Mascio* or its progeny, in which there remain unresolved conflicting opinions that might further limit Claimant's RFC. As discussed in additional detail below, the ALJ directly addressed the only opinion which might have further limited Claimant's RFC—that being, the opinion of Dr. McClanahan—and found it to be unsupported by the evidence. Furthermore, the ALJ very clearly explained how she accounted for Claimant's moderate limitation in concentration, persistence, or pace in the RFC finding. The ALJ explained that Claimant's concentration and pace were only mildly deficient, although Claimant endorsed memory issues and confusion. (Tr. at 16). The ALJ also explained that she adopted the prior ALJ's mental RFC finding, which concluded, based upon expert opinions, that Claimant could perform simple tasks notwithstanding her limitations. (Tr. at 18, 34-42).

In sum, upon reviewing the ALJ's decision and the entire record, the undersigned **FINDS** that the RFC determination is supported by substantial evidence. While the decision appears scant to Claimant, there was certainly no need for the ALJ to re-hash the discussion included in the prior decision; particularly, as the ALJ made clear in discussing the updated records, consultative examinations, and expert opinions, there was no significant change in Claimant's conditions following the prior decision. The prior decision is included in the present record and the discussion is incorporated by reference in the current decision under review.

### B. Credibility Analysis

Claimant next challenges the ALJ's analysis of her credibility and pain, stating that it "lacks any substance in terms of analysis or explanation" and fails to follow the applicable regulatory mandates. (ECF No. 13 at 9-10). Further, Claimant contends that the ALJ inappropriately determined her RFC before assessing her credibility. (*Id.* at 11).

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical

evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is

their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ considered Claimant's statements using the two-step process required by the ruling and regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 17-18). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. at 18). The ALJ discussed Claimant's diagnostic studies and consultative examination, as well as the fact that the agency consultants and prior ALJ found that Claimant could perform a reduced range of sedentary work involving only simple, routine, unskilled work and no public interaction. (Tr. at 18). The ALJ ultimately concluded that while the facts in the record did not dispute that Claimant had conditions which singly or in combination would cause her pain, the evidence suggested that Claimant's symptoms were not accurately reported, did not exist at the level alleged by Claimant, and did not impact Claimant's ability to engage in work-related activity to the extent claimed. (Tr. at 18). Overall, while the ALJ did not find that Claimant was fully credible in her allegations, the ALJ significantly reduced Claimant's RFC assessment to account for the weight of the evidence that the ALJ deemed credible. (*Id.*).

As shown above, the ALJ provided clear reasons, supported by the record, for her assessment that Claimant's statements were not fully credible. The ALJ did not address the credibility issue in a conclusory fashion, nor the did the ALJ impermissibly find Claimant's representations to be less than fully reliable solely because there was no objective evidence to support her statements. Rather, the ALJ reviewed the record and found that Claimant's testing and examinations, the prior ALJ's decision, the lack of significant change in Claimant's condition since 2012, and the opinion evidence, when considered as a whole, established that Claimant was not as limited as she alleged.

Furthermore, there is no indication that the ALJ determined Claimant's RFC before assessing her credibility as Claimant suggests. The ALJ's decision follows the standard format which lists the RFC finding in bold text and includes below the ALJ's explanation of the credibility analysis and RFC finding. The ALJ very clearly explained that she assessed Claimant's pain and credibility in order to make her RFC finding. (Tr. at 17). Therefore, the undersigned **FINDS** that the ALJ's credibility analysis was properly conducted in compliance with the applicable mandates, and her determination was supported by substantial evidence.

### C. Treating Physician's Opinion

In her next challenge, Claimant argues that the ALJ improperly discounted the opinion of Dr. McClanahan, which concluded that Claimant was more restricted than the ALJ found. (ECF No. 13 at 11-12). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually

most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the

more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4) Ultimately, it is the responsibility of the ALJ, not the Court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.*

at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In the instant action, the ALJ acknowledged Dr. McClanahan's opinion that Claimant could lift 30 pounds occasionally and 15 pounds frequently; could stand/walk for a total of only 1 hour in a workday; and sit for 4 hours total in a workday. (Tr. at 18). However, while the ALJ reduced Claimant's lifting and carrying RFC even more stringently than Dr. McClanahan found, the ALJ did not find that Dr. McClanahan's opinion as to Claimant's ability to stand or walk was supported by medical evidence. (*Id.*). The ALJ discussed the results of Claimant's MRIs, x-ray, pulmonary function testing, and consultative examination. (Tr. at 17). As the ALJ noted, Claimant had no muscle weakness or atrophy, could walk on her heels and toes, and walked without an assistive device. (Tr. at 17-18). Moreover, the ALJ gave great weight to the prior ALJ's decision and the state agency physicians who found that Claimant could sit for 6 hours total and stand or walk for 4 hours total in a workday. (Tr. at 18).

Notably, Dr. McClanahan provided the same opinion in July 2012 that Claimant could only stand or walk for 1 hour total in a workday and sit for a total of 4 hours in a workday. (Tr. at 354). The prior ALJ likewise gave little weight to the opinion, stating that Dr. McClanahan's opinions did not correlate with his findings on examination, the conservative level of therapy that he provided, or Claimant's activities. (Tr. at 41). This further bolsters the ALJ's conclusion that Claimant's condition did not significantly change following the prior ALJ's decision and supports the weight that the ALJ assigned to the prior ALJ's decision and Dr. McClanahan's opinion.

Ultimately, "[a]n ALJ's determination as to the weight to be assigned to a medical

43

opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (internal markings and citations omitted). In other words, the Court "must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence." (*Id.* at 271). In this case, the undersigned **FINDS** that there is more than a mere scintilla of evidence to support the ALJ's decision to assign little weight to Claimant's treating physician, Dr. McClanahan's, opinion. *Hays*, 907 F.2d at 1456 (Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."). The ALJ analyzed and weighed Dr. McClanahan's opinion against the conflicting evidence in the record and reasonably determined to assign it little weight.

### D. Discussion of the Evidence

In her final challenge to the Commissioner's decision, Claimant argues that the ALJ failed to demonstrate that she considered the entire record. Claimant points to the fact that the ALJ analyzed her physical impairments "in a single paragraph" and argues that the ALJ did not meaningfully discuss Claimant's psychiatric treatment. (ECF No. 13 at 12-13).

There is no regulatory requirement regarding the length of an ALJ's decision and, while an ALJ must consider the entire record, an ALJ is not required to comment on every piece of evidence. *Vest v. Colvin*, No. 2:15-CV-05886, 2016 WL 5334668, at \*8 (S.D.W. Va. Sept. 22, 2016). In this case, the ALJ's decision demonstrates that the ALJ considered the entire record. In terms of Claimant's physical impairments, the ALJ discussed Claimant's diagnostic studies, consultative examination, the ALJ's prior decision, the state agency physicians' opinions, and Dr. McClanahan's residual capacity questionnaire.

(Tr. at 17-18). Claimant does not point to any specific evidence that the ALJ overlooked, nor does the undersigned find any critical analysis that is absent from the ALJ's decision.

In terms of Claimant's mental impairments, Claimant faults the ALJ for not discussing her outpatient psychiatric treatment. However, the ALJ found Claimant's depression and anxiety to be severe impairments, discussed Claimant's consultative examination, and relied heavily on the prior ALJ's decision in crafting Claimant's mental RFC, which restricted Claimant to simple tasks and no public interaction. In doing so, the ALJ did not adopt the opinions of the state agency psychologists who reviewed the results of Claimant's July 2013 consultative examination and all of Claimant's records and concluded that Claimant was even less limited than assessed by the previous agency psychologists and the prior ALJ. In fact, both Dr. Boggess and Mr. Richard concluded in August and December 2013, respectively, that Claimant's updated evidence demonstrated that she had no more than mild mental limitations. (Tr. at 58, 90). Nevertheless, the ALJ determined to give great weight to the prior ALJ and prior experts' findings that Claimant's mental impairments imposed moderate limitations that restricted her to simple tasks and no public interaction.

It is unclear how any further discussion of Claimant's outpatient psychiatric treatment would have been probative of an ultimate finding of disability given the fact that Claimant's mental status examination was nearly consistently normal on examination other than a depressed and/or anxious mood and her diagnoses and treatment by medication remained consistent. (Tr. at 498-500, 576, 722-23). The ALJ acknowledged Claimant's psychiatric treatment and incorporated her mental diagnoses and limitations into the RFC finding. Therefore, the undersigned **FINDS** that the ALJ's decision demonstrated that she considered the entire record with respect to Claimant's

impairments.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 12); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 20); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if served by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  February 26, 2018

Cheryl A. Eifert
United States Magistrate Judge